# COURT OF CHANCERY
## OF THE
## STATE OF DELAWARE

DAVID HUME, IV
MAGISTRATE IN CHANCERY

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DE 19947

Report: July 02, 2026
Date Submitted: June 16, 2026

Thad Bracegirdle
Abraham C. Schneider
BAYARD P.A.
600 N. King Street, Suite 400
Wilmington, Delaware 19801
*Attorneys for Plaintiff Nikita Bernstein*

Scott B Czerwonka
Andrea S. Brooks
WILKS LAW LLC
4250 Lancaster Pike, Suite 200
Wilmington, Delaware 19805
*Attorneys for Defendant MyJoVE Corporation*

RE: *Bernstein v. MyJoVE Corporation*,
C.A. No. 2026-0301-DH

Dear Counsel:

This is my post-trial report on the parties' Title 8 Section 220 books and records action. Plaintiff is a former director and current stockholder of Defendant who seeks information about the nomination, selection, and independence of Defendant's directors. Before I can assess that claim, I must determine whether a release that Plaintiff signed as part of a stock repurchase by Defendant bars this action. Because I find that the release is valid and prevents Plaintiff from bringing this action, I find in favor of Defendant.

## I.    BACKGROUND

The facts are drawn from the factual stipulations in the parties' pre-trial order and forty-nine joint trial exhibits.[1]  Plaintiff Nikita Bernstein founded Defendant MyJoVE, a Delaware corporation, with Moshe Pritsker ("Pritsker") and Klaus Korak ("Korak") in 2007.[2]    MyJoVE is a multi-national company that presents and maintains videos that assist scientific and biomedical researchers with methods and procedures.[3]

Plaintiff initially served as Chief Technology Officer, as well as on Defendant's board of directors ("Board") with Pritsker and Korak.[4]   Plaintiff resigned from Defendant in June 2011, but remained on the Board.[5]  In November 2011, Pritsker and Korak voted to remove Plaintiff from the Board over Plaintiff's

---

[1] Unless otherwise noted, pleadings are cited by reference to items docketed in C.A. No. 2026-0301-DH ("D.I.").  Factual citations are to: the Pre-Trial Stipulation and Order, D.I. 22 ("PTO"); the Draft Trial Transcript ("Draft Tr."); and Joint Trial Exhibits (cited by "JX" number).  Additional citations are to Plaintiff's Pre-Trial Opening Brief ("POB"), Defendant's Pre-Trial Opening Brief ("DOB"), Plaintiff's Pre-Trial Answering Brief ("PAB"), and Defendant's Pre-Trial Answering Brief ("DAB").  At the time of this ruling, only the draft transcript has been prepared and citations to it refer to the rough copy of the transcript.

[2] PTO ¶¶ 11,13.

[3] *Id.*, ¶¶ 14–15.

[4] *Id.*, ¶¶ 18, 19, 24.

[5] *Id.*, ¶ 25.

objection.[6] Pritsker and Korak served thereafter as the sole directors. Plaintiff continues to hold Defendant's common stock despite his separation from Defendant.[7]

Plaintiff has filed four books and records actions, including this one, over the years.[8] In December 2024, this Court ruled in Plaintiff's favor in the third books and records action ("the Third Action"), subject to a confidentiality order.[9] The Third Action's production on December 27, 2024 revealed an asset listed as "Notes receivable from stockholders" ("Notes Receivable") valued at over $18 million.[10] Directors Pritsker and Korak received $2 million and $5.135 million, respectively, as loans recorded as Notes Receivable, between 2021 and 2024.[11]

On April 18, 2025 Plaintiff requested additional books and records about the Notes Receivable loans to Pritsker and Korak.[12] Five days later, Pritsker and Korak executed a Written Consent of the Majority Stockholders ("the First Written

---

[6] *Id.*, ¶ 26.

[7] *Id.*, ¶ 27.

[8] *Id.*, ¶¶ 30–32.

[9] *Id.*, ¶ 33.

[10] *Id.*, ¶ 37.

[11] *Id.*, ¶ 40.

[12] *Id.*, ¶ 42.

Consent") to increase the number of directors from two to three and to elect James Elgart ("Elgart") and Evan Hackel ("Hackel") as directors.[13]  Korak resigned as a director upon these elections.[14]  On April 25, two days after his election, Elgart resigned from the Board.[15]  That same day, Pritsker and Korak executed another Written Consent of the Majority Stockholders ("the Second Written Consent") electing Larry Siff ("Siff") to replace Elgart on the Board.[16]

On May 6, Defendant sent notice, including the First and Second Written Consents, to Plaintiff under 8 *Del. C.* Section 228 via certified mail at his Massachusetts address.[17]  Plaintiff's business counsel, Arsenio Lampiao ("Lampiao"), notified Defendant on July 11 that Plaintiff changed his domicile.[18] Six days later, Lampiao provided Defendant with Plainitiff's updated Texas address.[19]  On July 27, Plaintiff agreed to sell 889,679 of his shares back to Defendant for $2.5 million under a redemption agreement ("the Redemption

---

[13] *Id.*, ¶¶ 43–45.

[14] *Id.*, ¶ 46.

[15] *Id.*, ¶ 47.

[16] *Id.*, ¶¶ 48–49.

[17] *Id.*, ¶ 50; JX-16.

[18] JX-30 at MyJoVE000229.

[19] *Id.*, at MyJoVE000228-229.

Agreement") that included a release ("the Release").[20]    When the parties executed the Redemption Agreement, a confidentiality dispute regarding the books and records produced in the Third Action remained.  The next day, Defendant's counsel contacted Plaintiff's counsel to suggest that the pending confidentiality dispute could be dismissed or withdrawn consistent with the terms of the Redemption Agreement.[21]  Plaintiff's counsel initially disagreed, but ultimately withdrew the confidentiality motion on August 13 without conceding breach of the Redemption Agreement.[22]  On July 29, Plaintiff emailed Lampaio telling him that he just received the Section 228 information upon returning to Massachusetts.[23]

On September 30, Plaintiff's counsel sent the Demand for this case to Defendant's registered agent.[24]   Defendant's counsel responded on October 7, objecting to three categories of requested documents.[25]  On November 5, Defendant produced documents related to five other categories of requests.[26] Defendant refused

---

[20] PTO ¶ 53; JX-31.

[21] PTO ¶ 54.

[22] *Id.*, ¶¶ 55–57.

[23] JX-35.

[24] PTO ¶ 58.

[25] *Id.*, ¶¶ 61–62.

[26] *Id.*, ¶ 64.

to produce any other documents.[27]  Plaintiff filed the Complaint on March 4, 2026.[28]

Defendant filed its Answer on April 1.[29]  The Court held a one-day trial on June 16.[30]

## II.  ANALYSIS

The Parties stipulated that the Demand complied with the form and manner requirements in Title 8 Section 220.[31]  Before I turn to the substantive provisions of Section 220 to determine whether Plaintiff has stated a proper purpose and, if so, whether he has met the enhanced burden imposed by Section 220(g) for records falling under that subsection, I must consider the Release in the Redemption Agreement.  If the Release is valid and enforceable, then Plaintiff cannot sustain a direct action.

---

[27] *Id.*, ¶ 66.

[28] *Id.*, ¶ 69.

[29] *Id.*, ¶ 70.

[30] D.I. 37.

[31] PTO ¶ 72.

### A. The Release Bars Plaintiff's Demand and the 8 *Del. C.* Section 220 Action.

On July 27, 2025, Plaintiff sold 889,679 shares in the closely-held Defendant back to the company in exchange for $2.5 million.[32]  The Redemption Agreement contained the following provision:

> <u>Release.</u> With the sole exception of his right to enforce the terms of this Agreement, the Seller, for himself and his heirs, successors, assigns, advisors and affiliates (collectively, the **"Seller Releasors"**) hereby fully, forever, irrevocably and unconditionally releases, remises and discharges the Company and its affiliates, officers, directors, stockholders, employees, attorneys and advisors (collectively the **"Company Released Parties"**) from any and all claims, charges, complaints, demands, actions, causes of action, suits, rights, debts, sums of money, costs, accounts, reckonings, covenants, contracts, agreements, promises, doings, omissions, damages, executions, obligations, liabilities, and expenses (including attorneys' fees and costs), of every kind and nature which he ever had or now has against the Company Released Parties, including without limitation a claims related to the Seller's ownership of the Redeemed Shares and amounts payable with respect thereto.[33]

Our law defines a general release as "one which is intended to cover everything— what the parties presently have in mind, as well as what they do not have in mind . . . . Such general releases are in common use . . . . Their validity is unchallenged."

*Corp. Prop. Assocs. 6 v. Hallwood Gp. Inc.*, 817 A.2d 777, 779 (Del. 2003) (citations

---

[32] *Id.*, ¶ 53.

[33] JX 31, § 5.2.

omitted).  Releases that use terms like "any and all claims" and "including, but not limited to" are consistent with general releases.  *Koscho v. Merit Distrib. Gp.*, LLC, 2025 WL 2770543, at *2, *6 (Del. Super. Sep. 29, 2025).  Similar terms are present in this Release.  A release that includes heirs, successors, assigns, and affiliates, like the one before me, acts as a general release.  *Id.*  The Court looks to the intent of the parties to construe a release and ascertains this intent "from the overall language of the document."  *Corp. Prop. Assocs. 6*, 817 A.2d at 779.  If that language is ambiguous, then it will be construed against the drafter.  *Id.*

I do not find the language ambiguous.  The parties intended to release claims in exchange for Plaintiff's stock redemption.  The Release was intended to disclaim Plaintiff's personal actions against the Defendant.[34]  This is a comprehensive general release encompassing not only claims but "charges, complaints, demands, actions, causes of action, suits, rights, debts, sums of money, costs, accounts, reckonings, covenants, contracts, agreements, promises, doings, omissions, damages, executions, obligations, liabilities, and expenses."  In short, the parties agreed that Plaintiff would not seek recourse for all manner of grievances, past or pending, in exchange for the stock buyback.

---

[34] *Id.*, § 5.2 ("for himself and his heirs, successors, assigns, advisors and affiliates").

**B. Although The Release Bars Neither Derivative Actions Nor Prospective Direct Actions, The Plaintiff's Section 220 Action is Neither.**

The Release does not prevent Plaintiff from bringing prospective actions against the Defendant.[35] Plaintiff remains a stockholder and could bring claims arising from circumstances taking place after the Redemption Agreement's execution. But Plaintiff agreed that the investigation he seeks to conduct relates to actions before the Release.[36] All the same, he contends that had the parties intended to bar future claims, they could have done so explicitly.[37]

But to read the Redemption Agreement and embedded Release as Plaintiff needs me to and consider every action after execution as a "future" action would lead to an absurd result. Plaintiff's argument tries to make the best of the Release's disadvantageous language, but I cannot agree. Plaintiff's contention would undermine the entirety of the Release and the parties' intentions. His construction

---

[35] *Id.* ("of every kind and nature *which he ever had or now has* against the Company Released Parties") (emphasis added). In Comparison, Defendant included a release of prospective claims in a draft agreement to buy back more of Plaintiff's shares in February 2026. *See* JX-41 at NBERNSTEIN0000360-61 ("[T]he release set forth herein expressly includes . . . all derivative Claims, including any Claims that could be asserted on behalf of the Company or in the right of the Company under Delaware law, whether *currently asserted or not*, whether *known or unknown*") (emphasis added); POB at 46–47.

[36] Tr. 22:10–13. ("The investigation relates to the actions in April, 2025 so I will concede that.")

[37] Tr. 24:4–7 ("So I don't think it eviscerates (the Release) or makes it toothless; I think if the parties wanted to encompass future actions, they needed language to say that.")

would render the Release meaningless because any subsequent demand, claim, and the like would be permitted, even if they related to conduct before the Release. Under Plaintiff's theory of the Release, he was only barred from continuing to assert claims that he had already asserted prior to executing the Release.[38]

The Release does not prevent the Plaintiff from bringing a derivative claim. It is axiomatic that derivative actions are not personal to the stockholder-plaintiff. *California State Teachers' Ret. Sys. v. Alvarez*, 179 A.3d 824, 847 (Del. 2018) ("The named plaintiff…only has standing to seek to bring an action by and in the right *of the corporation* and never has an individual cause of action.") (emphasis in original). The Release specifically addresses direct claims that are personal to the Plaintiff, not derivative claims.[39] Furthermore, the import of derivative claims requires Court oversight of their release. "Under Rule 23.1, the Court must expressly approve the settlement and release of derivative claims." *Marchand v. Barnhill*, 2025 WL 3540294, at *9 (Del. Ch. Dec. 10, 2025). The Release in the Redemption Agreement

---

[38] Tr. 23:14–22 ("And it doesn't eviscerate the release or make it toothless; I think it's important to note that at the time [Plaintiff] signed the release agreement in July 2025, the prior 220 action was still open. There was an active motion in that where [Plaintiff] was requesting let me give your confidential information to third parties. He was using that action to say hey, give me updated financials, this needs to keep coming.").

[39] "[T]he Seller, for himself and his heirs, successors, assigns, advisors and affiliates." JX-31, § 5.2.

does not expressly release derivative claims and the parties did not seek or obtain Court approval for a derivative claims release. Plaintiff may bring a derivative action.

But that does not entitle Plaintiff to the relief he seeks. This section 220 books and records action is a direct claim, not a derivative one. Plaintiff's counsel admitted the direct nature of this action at trial.[40] Plaintiff seeks refuge in an argument that links this Section 220 action with future derivative litigation. Summarizing Plaintiff's position, since the Section 220 materials will be used in a future derivative litigation not subject to the Release, the Section 220 is interwoven with the derivative suit and is not subject to the Release.[41] But there is no authority supporting intertwined Section 220 and derivative suits. It is undeniable that Section 220 books and records actions often precede derivative suits. *Schoon v. Smith*, 953 A.2d 196, 208 (Del. 2008) (citation omitted) (Describing Section 220 proceedings as the "tools at hand" to obtain books and records information before a derivative

---

[40] "THE COURT: Would you agree that a 220 is a direct action as opposed to derivative.

PLAINTIFF'S COUNSEL: I will agree to that, I will concede that and I won't fight on that point." Tr. 16:15–19.

[41] "PLAINTIFF'S COUNSEL: I know obviously in derivative litigation, the Court is constantly telling derivative plaintiffs go get books and records because those two actions are so interwoven but I didn't see specific authority connecting the waiver of a derivative claim to the release of a books and records action that might be related to it." Tr. 17:2–9.

suit). But a precursor is not a prerequisite. Derivative litigation can be had without a prior Section 220 action.[42] Plaintiff has presented no authority that transforms a Section 220 proceeding from a direct action to a derivative one simply because the books and records may support a derivative case.

Furthermore, Plaintiff's theory presents a nearly unworkable standard for the Court. To the extent the Release only bars direct actions, not derivative ones, and Section 220 suits filed in reasonable anticipation of a plenary derivative suit fall within the "derivative category," then the Court would need to "look through" the Section 220 demand to ascertain whether it is a reasonable precursor to the derivative suit. Additionally, such theory disregards the Procedural protections of Court of Chancery Rule 23.1 for derivative actions. This revolutionary theory of Books and Records finds no grounding in caselaw or statute.

---

[42] And certainly, a Plaintiff may file a Section 220 suit without intending to ultimately pursue plenary derivative litigation, especially where the purpose for the books and records demand pertains to appraisal of the party's stock in a closely-held entity.

### C. The Release Includes Unknown Claims, and Plaintiff Had Notice of the Board Actions.

Plaintiff argued that the Release did not include unknown claims because it did not expressly encompass "claims both known and unknown."[43] Plaintiff further alleged that the directors' actions were unknown to him because the Section 228 notice was sent to his Massachusetts rather than Texas address, and Defendant had knowledge of his address change. Plaintiff's argument on the unknown claims is unavailing. The Release discharged a multitude of potential activities "of every kind and nature which he ever had or now has against the Company Released Parties."[44] This type of language has been interpreted to include unknown claims. *Rust v. Rust*, 2023 WL 3120545, at *8 n.100 (Del. Ch. Apr. 27, 2023) ("a release of claims a party 'had or now has' does *not* exclude unknown claims") (emphasis in original). The Release that Plaintiff signed covered all his pending and past direct claims, known and unknown.

---

[43] PAB at 11. I have concluded that derivative claims were not included in the Release. I address the unknown claims argument here because the Defendant contends that "Plaintiff claims that 'the books and records demand in this action concern corporate events that Plaintiff only discovered after entering into the Redemption Agreement containing the Release.'" DAB at 5 (quoting POB at 44).

[44] JX-31, § 5.2.

Concurrently, Plaintiff argues "the books and records demanded in this action concern corporate events that Plaintiff only discovered after entering into the Redemption Agreement containing the Release."[45]  Not so.  The timeline directly refutes this assertion.  The Defendant mailed the Section 228 notice to Plaintiff's Massachusetts address on May 6, 2025.[46]  On June 12,  Lampiao sent an email to Defendant's counsel regarding receipt of a June 10 package sent to the Massachusetts address.[47]  Lampiao advised Defendant on July 11 that Plaintiff no longer lived in Massachusetts.[48]  This is before Plaintiff signed the Redemption Agreement and Release on July 17.[49]  Lampiao provided Plaintiff's Texas address to Defendant on July 17, but gave no effective date for the move.[50]

Plaintiff suggests that the June 12 Lampiao email put Defendant on notice "that Plaintiff had moved and was not receiving physical mail in Boston."[51]  That argument stretches the substance of the email to the breaking point.  In that email,

---

[45] POB at 44.

[46] JX-16.

[47] JX-24.

[48] JX-30.

[49] JX-31.

[50] JX-30.

[51] PAB at 14.

Lampiao wrote, "However, as my client is *currently* outside the Boston area and unable to retrieve physical mail promptly, I would appreciate your courtesy in forwarding the correspondence, along with any related documents, by email."[52] There is no mention of Plaintiff moving and the use of "currently" conveys a return to Massachusetts. Defendant did not have notice of Plaintiff's move until July.

Title 8 Section 232 addresses when stockholders are deemed to receive notice from a corporation. It specifies that notice may be given to the stockholder's mailing address and is effective when deposited in the U.S. mail.[53] As Plaintiff conceded, this statutory version of the mailbox rule provides no rebuttable presumption.[54] Plaintiff received notice. Plaintiff's pre-trial briefs made no mention of the common law mailbox rule. At trial, Plaintiff argued that the common law mailbox rule is a rebuttable presumption.[55] Plaintiff waived consideration of this argument when it did not include it in the pre-trial briefing. Still, Plaintiff failed to rebut the presumption. Defendant sent the Section 228 notice to Plaintiff's address on May

---

[52] JX-24 (emphasis added). The correspondence referenced is the June 10 stock buyback package, not the May 6 section 228 package.

[53] 8 *Del. C.* § 232(a)(1) (a codification of the common law mailbox rule).

[54] Tr. 33:14-20.

[55] Tr. 32:20-24. Plaintiff provided two cases discussing the mailbox rule and the rebuttable presumption for the first time at trial: *Graham v. Com. Credit Co.*, 194 A.2d 863 (Del. Ch. 1963) and *Windom v. Ungerer*, 903 A.2d 276 (Del. 2006).

6.   More than two months later, Lampiao told Defendants that Plaintiff no longer resided in Massachusetts, and six days after that, Lampiao gave them Plaintiff's Texas address.[56]  It is unreasonable to expect a party to search its files and resend documents from weeks or months before on a speculative, unsubstantiated belief that another party did not receive them.  Compliance would be impossible.  Defendant had no reason to believe Plaintiff did not receive the Section 228 documents.  This is supported by Lampiao's communications with Defendant.  On July 11, Lampiao notified Defendant that Plaintiff redomiciled, but did not provide a new address.[57] Six days later, he provided Plaintiff's Texas address with a request to "add Nikita's details as below."[58]  It would be patently reasonable for Defendant to assume that Plaintiff's move was recent, for why else would Lampiao have not provided the address on July 11?  For certain, it did not give rise to a reasonable belief that Plaintiff was redomiciled in Texas on May 6.  Plaintiff would also fail at rebutting a presumption because he received documents at the Massachusetts address in June,

---

[56] JX-30.

[57] JX-30.

[58] JX-30

as evidenced by Lampiao's June 12 response.[59]   The June 10 document package

Lampiao referenced was sent over a month after the Section 228 notice.

### D.  The Valid Release Bars Substantive Determination of Plaintiffs Books and Records Action.

Having found the Release valid against Plaintiff's direct claims, I need not

consider substantive issues of whether Plaintiff (1) established a proper purpose, (2)

showed a reasonable relationship between the purpose and the records sought, and

(3) whether the records sought are necessary and essential to the proper purpose.

The Release renders these issues moot.

### III.   CONCLUSION

For the reasons explained above, I recommend that judgment be entered in

favor of the Defendant.  This is a final report pursuant to Court of Chancery Rule

144.

Sincerely,

*/s/ David Hume, IV*

David Hume, IV
Magistrate in Chancery

cc:    All counsel of record (by File & ServeXpress)

---

[59] JX-24.